IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
June 9, 2015 Session

**STATE OF TENNESSEE v. DOMNICK DORIA**

**Appeal from the Circuit Court for Montgomery County**
**No. 41200380     Michael R. Jones, Judge**

_____

**No. M2014-01318-CCA-R3-CD – Filed April 26, 2016**

_____

Defendant, Domnick Doria, was indicted by the Montgomery County Grand Jury for 39 counts of sexual exploitation of a minor. Defendant was convicted as charged in counts two, three, four, and six. Defendant was convicted of a lesser-included offense in counts one, five, and seven through thirty-nine. Defendant received an effective sentence of 13 years for all his convictions. In this appeal as of right, Defendant contends that the trial court erred by denying his motions to suppress his statement to police and evidence collected from his home during the execution of a search warrant; that the evidence is insufficient to support his convictions; that the trial court improperly admitted hearsay testimony; that the trial court erred by admitting previously excluded evidence; that Defendant's convictions violate the double jeopardy clause; and that the trial court erred by imposing consecutive sentencing. Having reviewed the entire record and the briefs of the parties, we conclude that the judgments of the trial court should be affirmed.

**Tenn. R. App. P. 3 Appeal as of Right, Judgments of the Circuit Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Margaret E. Garner, Clarksville, Tennessee, for the Appellant, Domnick Doria.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel, John Wesley Carney, Jr., District Attorney General; and C. Daniel Brollier, Assistant District Attorney General, for the Appellee, State of Tennessee.

# OPINION

## *Motions to Suppress*

Defendant filed two pretrial motions to suppress. One motion sought to suppress evidence found at Defendant's home during the execution of a search warrant. The other motion sought to suppress Defendant's statement he made at his home during the execution of the search warrant. Following an evidentiary hearing, the trial court denied Defendant's motions.

Investigator Mike Cereceres, of the Montgomery County Sheriff's Office, testified that on July 11, 2011, he executed a search warrant at 3864 Northeast Drive, Apartment B, in Clarksville. The affidavit in support of the search warrant was admitted as an exhibit to the hearing without objection. The affidavit included information describing Cereceres' background as an investigator assigned to the Internet Crimes Against Children ("ICAC") Task Force. The affidavit indicated that Cereceres is "a Certified Computer Forensic Examiner" with the sheriff's office. Investigator Cereceres testified that the designation was an error, and he was not certified although he had attended a training course. In preparing the affidavit, Investigator Cereceres used a template that already contained boilerplate language that the affiant was a certified computer forensic examiner. He testified that he had previously removed that language in preparing affidavits for other search warrants, but he inadvertently left the incorrect statement of credentials in the affidavit he prepared in this case. Investigator Cereceres testified that his "purpose [wa]s not to be deceitful." He testified, "I have done way too many cases, there is no need to lie."

The trial court denied Defendant's motion to suppress evidence seized during the execution of the search warrant. The trial court found that "[i]t was purely inadvertence on [Cereceres'] behalf and not intended by any means to sway the issuing magistrate one way or the other[.]"

The following testimony is pertinent to Defendant's motion to suppress his statement to Investigator Cereceres during the execution of the search warrant. Investigator Cereceres arrived at Defendant's residence to execute the search warrant at 5:20 a.m. Investigator Cereceres and another officer were both armed. Defendant shared the apartment with two roommates who were present when Investigator Cereceres arrived, but Defendant had already left to go to work. Investigator Cereceres asked the roommates to contact Defendant. Investigator Cereceres explained that he "like[s] to have everyone there, whosoever room that is, [he] would like them to be there during execution to obtain statements." One of the roommates called Defendant, and Defendant arrived shortly thereafter.

2

By the time Defendant returned to the apartment, all of the rooms containing a computer had been searched except for Defendant's room. Investigator Cereceres spoke to Defendant and told him his purpose for being there. Investigator Cereceres showed Defendant the search warrant. Investigator Cereceres asked Defendant if he had a computer, and Defendant responded that there was a computer in his bedroom. Investigator Cereceres testified that he advised Defendant of his *Miranda* rights and that Defendant read and signed a waiver of rights form. Investigator Cereceres did not make an audio or video recording of Defendant being advised of his rights. Investigator Cereceres asked Defendant questions which he wrote on the back of the waiver of rights form, and Defendant wrote his answers. Investigator Cereceres asked Defendant if he used "peer-to-peer" software. Investigator Cereceres testified that Defendant did not attempt to leave the interview.

Defendant testified that a search warrant was executed at his apartment on July 11, 2011. At the time of the search, Defendant was a sergeant in the infantry at Fort Campbell. On the morning of the search, Defendant left his apartment at 4:30 a.m. to report for work at 5:00 a.m. Defendant had passed through the security gates at Fort Campbell when he received a phone call from his roommate Paul Nacin advising him that the police were at the apartment. Defendant immediately informed his platoon sergeant that he would be late for work, and Defendant returned to the apartment.

When Defendant arrived at the apartment, he was met by Investigator Cereceres and another officer who was armed. Mr. Nacin and Mr. Porter were also in the apartment. Defendant could not recall whether Investigator Cereceres was armed, but he testified that he was wearing a bullet-proof vest. Defendant testified that Investigator Cereceres advised him not to talk to his roommates. Defendant testified,

> The questioning came about, we came in my room, said is that your computer? I said yes. We sat down on the bed and he also looked around and I opened the closet for him, to show him I had no other objects, storing device of computer images. And then he asked me if I had people-to-people sharing network and I informed him yes and then before the questioning went on any further, he said hold on, let me write these down and then you can answer them.

Defendant testified that Investigator Cereceres did not advise him of his *Miranda* rights. He testified that he would not have answered Investigator Cereceres' questions if he had been advised of his rights. Defendant expressed concern about losing his rank of sergeant, and Investigator Cereceres told Defendant, "I'll make sure that when everything

3

does happen, the Army takes it easy on you." Defendant testified, "I figured I would cooperate as best I possibly could and answered every question he gave me."

Defendant testified that after he answered all of Investigator Cereceres' written questions, Investigator Cereceres told him to "flip [the form] to the back" and sign and date it, "stating that everything [Defendant] answered was to the best of [his] knowledge and as truthful as possible." Defendant testified that he did not read over the form. Defendant wrote the time as 5:29 a.m.

The back of the form reads as follows:

> I Domnick Doria have lime wire and frost wire and have download[ed]
> P2P networking on my computer along with songs and have accidently
> [sic] downloaded other things[.]  I also do searches of taboo materials
> and strange fetishes such as
> moms/incest/pee/[b]eastiality/tranny/shemale/sons/[b]rother,sister
>
> 1)  Did you install the P2P network programs?
> A – yes I am [sic]
>
> 2)  Have you ever searched for child pornography?
> A – no I have not
>
> 3)  Will I find child sex abuse images on this computer owned by you[?]
> A – yes by accident
>
> 4)  What have you accidentally downloaded[?]
> A – There are images of mothers with there [sic] kids
>
> 5)  Around how many images will I find of child sex abuse, will I find
> on you[r] computer?
> A – approximately 25

Defendant testified that he signed the document and noted "0529" as the time. Defendant denied that he wrote "6:03" on the front page of his statement. He testified that he always wrote the time in military time. Defendant testified that he arrived at Fort Campbell at "4:50ish" and returned to the apartment between 5:20 and 5:25. Defendant estimated that it took him approximately 15 to 20 minutes to commute between work and home.

Defendant testified that he would not have made a statement to Investigator Cereceres if he had been advised of his rights. He also testified that if he had known that Investigator Cereceres lacked any leverage with the Army, he would not have answered his questions. Defendant testified that he did not feel free to leave and believed that he would be arrested if he attempted to leave. Defendant testified that he believed "it was mandatory to be there" during the execution of a search warrant.

At the conclusion of the hearing, the trial court accredited Investigator Cereceres' testimony and found that Defendant was advised of his *Miranda* rights. The trial court denied Defendant's motion to suppress his statement.

*Trial*

Michael Cereceres testified that in 2011, he was an investigator with the Internet Crimes Against Children ("ICAC") unit of the Montgomery County Sheriff's Office and was the lead investigator in Defendant's case. Investigator Cereceres used "peer-to-peer" or file sharing software to locate people who were creating and disseminating child pornography. Using information obtained through that software, Investigator Cereceres obtained a search warrant for Defendant's residence. Investigator Cereceres seized Defendant's computer during the search. Defendant gave a statement to Investigator Cereceres. Defendant stated that he had "accidentally downloaded" images of child sexual abuse. Defendant also stated that he had done computer searches "of tab[oo] materials and strange fetishes such as [m]oms, incest, . . . shemales, sons, brother, sister." Investigator Cereceres executed the search warrant on July 11, 2011.

Investigator Cereceres testified that other residents in the apartment had access to Defendant's computer. He testified that Defendant's roommates, Mr. Nacin and Mr. Porter, each had their own computer and all of them were connected to the same IP address, however, Defendant's computer had the globally unique identification number ("GUIN") of the file-sharing software. Neither of Defendant's roommates' computers contained peer-to-peer software. Investigator Cereceres conducted a cursory review of those computers and found no evidence of downloaded child pornography. Investigator Cereceres retrieved Defendant's computer and turned it over to Scott Levasseur for forensic examination. In order to preserve evidence, Investigator Cereceres did not conduct a cursory review of Defendant's computer. Defendant's statement was admitted as evidence and read to the jury.

Paul Nacin testified that he served with Defendant in the Army. Mr. Nacin and Defendant were both deployed to Afghanistan in 2011. They became roommates when Mr. Nacin returned from Afghanistan in April, 2011. Mr. Nacin testified that he had

never used Defendant's computer and that he had never observed Defendant looking at child pornography on Defendant's computer.

Andrew Porter was also roommates with Defendant and served with Defendant in Afghanistan. Mr. Porter was present at the time the search warrant was executed. Mr. Porter testified that he never used Defendant's computer and that he never saw anyone else use Defendant's computer. Mr. Porter testified that he never observed Defendant looking at pornographic images on his computer.

Scott Levasseur, a detective with the Dickson County Sheriff's Office, was assigned to the F.B.I. Task Force in Nashville to investigate internet crimes against children. Detective Levasseur was tendered as an expert in computer forensic examinations and peer-to-peer child pornography examination without objection by Defendant. Detective Levasseur conducted a forensic examination of Defendant's computer at the request of the Montgomery County Sheriff's Office. Detective Levasseur made an exact copy of the computer hard drive. His examination revealed that the computer was registered to Defendant. Detective Levasseur located more than 4,000 images and 61 video files of child pornography on Defendant's computer in both "live" and "deleted" formats. He explained that "live" files are available for any user to open and view, and "deleted" files are files that have been deleted and placed in the recycle bin where they remain until the contents of the recycle bin are deleted. Detective Levasseur provided the dates in May, 2011 through July, 2011, on which the files were downloaded onto the computer.

Detective Levasseur testified that he found no "other user activity except for the defendant[.]" He testified that it was his opinion, based on Defendant's statement and his examination of Defendant's computer, that Defendant was the individual who downloaded the images onto the computer. He testified, "Yes, sir, I have no doubt [Defendant] is responsible for it." Detective Levasseur testified that it was "fairly easy" to associate the child pornography downloads with a particular user. He testified, "all of the accounts, internet account history, pictures, stuff like that, all belonged . . . they were of the defendant[.]" Detective Levasseur observed activity on Facebook and Skype, and both accounts belonged to Defendant. He identified another user on the laptop by the name and profile of "Jennifer Relsarro." Detective Levasseur attempted to locate "Jennifer Relsarro" by searching every police database and was unsuccessful. He testified that there were no women living in Clarksville by that name. He conducted "a reverse picture look up on the internet" and found the photograph appeared on over 200 websites, and it was originally created in an amateur pornographic site. Detective Levasseur testified that "it is not unusual for people on the internet to pose – as males posing as females, and vice versa so – but I was able to in fact, confirm that this woman doesn't live in Clarksville and that is made up, this profile is made up." The profile

"Jennifer Relsarro" was using Yahoo Instant Messenger to access and download child pornography.

Detective Levasseur testified that, in his opinion, "Jennifer Relsarro" was a user account created by Defendant and "used by the Defendant to download child pornography from other users on the internet." He testified:

> The interesting fact with her use on instant messenger and the defendant's use, they coincide with each other. You have her logged in requesting specific types of child pornography files from users out there in cyberspace and then you have her logging off instant messenger and within one minute, the defendant's account, Dom Doria 13 gets logged in. So that gets me digging deeper and looking at the access of this account with other accounts and I am able to see that every time this account is used, other accounts belonging to the defendant are used just before or just after or during, when this person is logged in. So – it is pretty obvious that it is the same person.

Detective Levasseur's examination of Defendant's computer revealed an instance where Defendant was playing an online game using an account or profile identified with him at the same time that a child pornography file was being accessed or downloaded. Detective Levasseur also conducted a search to determine whether Defendant's roommates had used his computer and found no information that anyone besides Defendant had used the computer, with the exception of "one small [S]kype fragment that [he] was able to get out," which was a communication between Andrew Porter and his girlfriend.

Detective Levasseur testified that there were "about ninety child pornography images" in the "download folder" on Defendant's computer. He testified that "mixed in with those child pornography files are some images of the Defendant in his Army uniform, he looked like he was on deployment[.]" Detective Levasseur found "a total of sixty-six pornographic video files. Thirty-four of those were child pornography and we are talking live files . . . and then fourteen of them were of adult porn[.]" Detective Levasseur explained that "frostwire is a peer-to-peer file sharing program." He explained that users input search terms to locate specific files. Users of the file sharing program are connected from "all over the world." Detective Levasseur also found "six pages" of partially downloaded files containing pornographic images and videos of children in the "incomplete" folder on Defendant's computer. Detective Levasseur noted several occasions when child pornography files were downloaded onto Defendant's computer while Defendant was logged in using his username or profile. Detective Levasseur found

7

no evidence that a virus or malware downloaded child pornography onto Defendant's computer.

Defendant testified that the computer taken from his apartment examined by Detective Levasseur belonged to him. He testified that his mother sent him the laptop while he was deployed in Afghanistan to "just watch movies and play music in [his] down time." He also used his computer to communicate with his family. Defendant testified that "only a select few guys" had computers there, and he often allowed other soldiers to use his computer. Defendant was surprised that Detective Levasseur did not find any chat fragments from other soldiers on his computer. Defendant testified that his account passwords were saved on his computer, and other people could access his accounts while using his computer. He testified that he did not monitor other soldiers' use of his computer. Defendant testified that soldiers used flash drives or external hard drives to download files from each others' computers.

Defendant returned from Afghanistan in April, 2011, and moved into an apartment he shared with Andrew Porter and Paul Nacin. Defendant testified that he did not keep his bedroom door locked and that he kept his computer either in his bedroom or in the living room. Defendant testified that in the first "couple of weeks that we were first back [from Afghanistan], we had a lot of people at the house." Defendant testified that both of his roommates had their own computers.

Defendant testified that he downloaded Frostwire to download music and movies. He acknowledged that he gave a written statement to the police. Defendant added that he searched certain terms "to find role playing material." Defendant denied that he searched terms to download child pornography. Defendant testified that he downloaded child pornography by accident, and he attempted to delete it. Defendant added that he had no specialized computer training.

Defendant testified that on the night before the search warrant was executed, he and his two roommates were the only people present in the apartment. He testified that he stayed up late playing his X-Box. Defendant was unaware of anyone having access to his computer that evening. Defendant denied that he downloaded child pornography that evening.

*Sentencing*

At the sentencing hearing, the presentence report was admitted as an exhibit. Cynthia Demarks, Defendant's mother, testified that Defendant and his wife moved into her house in July, 2013. She described Defendant as a "wonderful" and "caring" young

man growing up who was never in trouble. Ms. Demarks and Defendant's father divorced when Defendant was eleven years old.

Ms. Demarks testified that Defendant was deployed twice while serving in the Army. Defendant was first deployed to Iraq and later to Afghanistan. She testified that Defendant was honorably discharged in August, 2012, and his discharge was not connected to this case. Ms. Demarks testified that Defendant could live with her upon his release from incarceration, and she would make sure Defendant complies with the sex offender registry.

Dominic Doria, Sr., Defendant's father, testified that he had a "very good relationship" with Defendant. He testified that Defendant was "a good boy" growing up and did not get into trouble. He testified that Defendant could live with him after his release and work with him as a landscaper.

Lauren Doria, Defendant's wife, testified that she began dating Defendant in July, 2011, while this case was pending. She and Defendant married on April 21, 2012. Their son was born three weeks prior to the sentencing hearing. Ms. Doria testified that Defendant was unable to be present for the birth of their son. Ms. Doria testified that she lived in Florida with Ms. Demarks, but she planned to move to Tennessee to be closer to Defendant. She understood that Defendant would be required to register as a sex offender. She described Defendant's family as being "tight knit." She testified that Defendant suffered from anxiety and depression from having seen "his friends die in front of him" during his deployments. She testified that Defendant had received treatment for his depression.

The trial court sentenced Defendant to nine years for each of his four separate Class B felony convictions, four years for each of his eleven Class C felony convictions, and three years for his remaining convictions, all Class D felonies. The court ordered that all of Defendant's Class B felony convictions be served concurrently and that his Class C and D felony convictions be served concurrently with each other, but consecutive to his Class B felony convictions, for a total effective sentence of 13 years.

*Analysis*

*Validity of search warrant*

Defendant challenges the trial court's ruling on his motion to suppress evidence obtained from the search of his residence. Specifically, Defendant argues that: 1) the warrant was void because it was not issued upon the application of the District Attorney General; 2) the sworn affidavit of Investigator Cereceres contained false information

about his certification and training; and 3) the criminal activity described in the affidavit was stale and did not establish probable cause. The State responds that the trial court properly denied Defendant's motion to suppress.

A trial court's factual determinations made in deciding a motion to suppress will be upheld on appeal unless the evidence preponderates otherwise. *State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012). Determinations regarding the credibility of witnesses, the weight or value of the evidence, or conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). "The prevailing party in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Day*, 263 S.W.3d 891, 900 (Tenn. 2008). If the factual findings are based entirely on evidence that does not involve a credibility determination, appellate review is de novo. *State v. Moats*, 403 S.W.3d 170, 177 (Tenn. 2013). However, if the evidence involves credibility determinations, the appellate court defers to the trial court's factual findings unless the evidence preponderates otherwise. *State v. Garcia*, 123 S.W.3d 335, 343 (Tenn. 2003). The trial court's application of the law to the facts is reviewed de novo. *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000).

Under both the Tennessee and United States Constitutions, no search warrant may be issued except upon probable cause, which "requires reasonable grounds for suspicion, supported by circumstances indicative of an illegal act." *State v. Smotherman*, 201 S.W.3d 657, 662 (Tenn. 2006). Tennessee requires a written and sworn affidavit, "containing allegations from which the magistrate can determine whether probable cause exists," as "an indispensable prerequisite to the issuance of a search warrant." *State v. Henning*, 975 S.W.2d 290, 294 (Tenn. 1998). The affidavit must contain more than mere conclusory allegations on the part of the affiant. *Id*. The standard to be employed in reviewing the issuance of a search warrant is "whether the issuing magistrate had 'a substantial basis for concluding that a search would uncover evidence of wrongdoing.'" *Smotherman*, 201 S.W.3d at 662 (quoting *State v. Ballard*, 836 S.W.2d 560, 562 (Tenn. 1992)).

Our supreme court has explained that, in order to establish probable cause for the issuance of a search warrant, the underlying affidavit "must set forth facts from which a reasonable conclusion might be drawn that the evidence is in the place to be searched." *State v. Smith*, 868 S.W.2d 561, 572 (Tenn.1993) (citations omitted). "The nexus between the place to be searched and the items to be seized may be established by the type of crime, the nature of the items, and the normal inferences where a criminal would hide the evidence." *Id*. (citation omitted); *see also State v. Saine*, 297 S.W.3d 199, 206 (Tenn. 2009) (recognizing that an affidavit in support of a search warrant "must show a

10

nexus among the criminal activity, the place to be searched, and the items to be seized") (citing *State v. Reid*, 91 S.W.3d 247, 273 (Tenn. 2002); *Smith*, 868 S.W.2d at 572)). "In determining whether probable cause supports the issuance of a search warrant, reviewing courts may consider only the affidavit and may not consider other evidence provided to or known by the issuing magistrate or possessed by the affiant." *Id.* (citing *State v. Carter*, 160 S.W.3d 526, 533 (Tenn. 2005)).

A.     Application for search warrant

Defendant asserts that the warrant in this case is void because it was not signed by the District Attorney General. The application for the warrant in this case was signed by Assistant District Attorney General Kimberly Lund. Defendant contends that a warrant issued for violation of Tennessee Code Annotated section 39-17-1003 requires the signature of the District Attorney General and only the District Attorney General under the statute. *See* T.C.A. § 39-17-1007. Defendant argues that if the legislature wanted the District Attorneys General to delegate the responsibility of seeking a warrant in a case involving the sexual exploitation of minors to an assistant district attorney, it would have specifically authorized the delegation of that authority as it did in Tennessee Code Annotated § 8-7-501, which provides in part:

> Whenever required by the grand jury, the district attorney general *or a designated assistant* may attend before that body for the purpose of assisting in its inquiries, which assistance may include the examination of witnesses and the giving of legal advice as to any matters cognizable by that body[.]

The State responds that the District Attorney General properly delegated the duty of seeking a warrant to an assistant district attorney under Tennessee Code Annotated section 8-7-103(7) as a necessary function of prosecuting cases. It is the duty of the District Attorneys General to "[p]rosecute in the courts of the district all violations of the state criminal statutes and perform all prosecutorial functions attendant thereto[.]" T.C.A. § 8-7-103(1). A well-established function of the duty to prosecute is the authority to seek a warrant, presentment, information, or indictment. In order to execute his duties, however, the District Attorney General "shall have the authority to delegate the foregoing duties and responsibilities to an assistant district attorney general." T.C.A. § 8-7-103(7). This court has held,

> . . . [T]here is no requirement or mandate that the District Attorney General must personally perform any of the duties relegated to him by the Constitution or the Legislature. To the contrary, by implication and directly, the statutes carry the connotation that an Assistant District

11

> Attorney General may act in the stead of the [District] Attorney General in whatever capacity he is called upon to serve.

*State v. Taylor*, 653 S.W.2d 757, 760 (Tenn. Crim. App. 1983).

Defendant cites Tennessee Code Annotated section 39-17-1007, which provides, "No process, except as otherwise provided, shall be issued for the violation of §§ 39-17-1003 – 39-17-1005 unless it is issued upon the application of the district attorney general of the district." Defendant relies upon *State v. Timothy Wade Davis*, No. E2003-02163-CCA-R3-CD, 2004 WL 2378251, at *7 (Tenn. Crim. App. Oct. 25, 2004), in which the defendant challenged the validity of a search warrant under Tennessee Code Annotated section 39-17-1007, and a panel of this court held that "process" includes seeking a search warrant and therefore any "process" involving the offense of sexual exploitation of a minor requires the involvement of the District Attorney General. Unlike the facts in *Timothy Wayne Davis*, however, where it was "undisputed that the District Attorney General's Office had no involvement in seeking or obtaining issuance of the search warrant[,]" in this case, the application for the warrant to search Defendant's apartment involved the District Attorney General's office as evidenced by the signature of Assistant District Attorney Lund.

The trial court made the following findings relative to Defendant's assertion that the search warrant was void due to the absence of the District Attorney General's signature on its application:

> Now, there hasn't been any evidence entered that Kimberly Lund is an assistant attorney general or whatever, District Attorney General, all of us know that she is. I can't recall the name of the case that we had to look at a couple of years ago, on the functions of the Assistant District Attorney Generals [sic], and that is that they can do anything the [District] Attorney General can do. That is specifically what that case says and [the] Legislature should have been aware of that decision when this act was passed. So I do not believe the intent would have been to limit that to one person and the staff – so I am going to deny the motion on that ground.

We agree with the State and the trial court. Although, as Defendant asserts, Tennessee Code Annotated section 39-17-1007 does not contain the same language specifically approving the delegation of authority by the District Attorneys General to Assistant District Attorneys General, the District Attorney General possesses the authority to delegate his duties under Tennessee Code Annotated section 8-7-103(7). Defendant is not entitled to relief on this issue.

B.      Affidavit contained false information

Defendant also contends that the search warrant is invalid because it was based on an affidavit that contained false information about the affiant's training as a certified computer forensic examiner and information later "proven to be false through evidence presented at trial." The State responds that the evidence does not preponderate against the trial court's finding that the information contained in the affidavit was not made with the intent to deceive the magistrate. Defendant also asserts that the warrant is invalid because several statements contained in the affidavit were shown to be false by proof adduced at trial, specifically, by the testimony of Detective Scott Levasseur.

A magistrate must rely on accurate information in making a probable cause determination. *State v. Norris*, 47 S.W.3d 457, 469 n.4 (Tenn. Crim. App. 2000). An affidavit containing false or misleading information may invalidate a search warrant. *State v. Little*, 560 S.W.2d 403, 407 (Tenn. 1978); *see Franks v. Delaware*, 438 U.S. 154, 155-56 (1978) (holding that the fruits of a search shall be excluded when the affidavit supporting the search warrant includes intentionally false statements or recklessly false statements by the affiant that are necessary to the finding of probable cause). In *Little*, the Tennessee Supreme Court concluded:

> [T]here are two circumstances that authorize the impeachment of an affidavit sufficient on its face, (1) a false statement made with intent to deceive the Court, whether material or immaterial to the issue of probable cause, and (2) a false statement, essential to the establishment of probable cause, recklessly made. Recklessness may be established by showing that a statement was false when made and that affiant did not have reasonable grounds for believing it, at that time.

*Little*, 560 S.W.2d at 407. "In order to be 'essential to the establishment of probable cause,' the false statement must be the only basis for probable cause or if not, the other bases, standing alone, must not be sufficient to establish probable cause." *Norris*, 47 S.W.3d at 469 n.4 (citing *State v. Tidmore*, 604 S.W.2d 879, 882 (Tenn. Crim. App. 1980)).

Regarding Investigator Cereceres' statement that he was a certified computer forensic examiner, the trial court accredited Investigator Cereceres' testimony and found as follows:

> I am going to address first the affidavit in support of the search warrant, and that is paragraph two, where it says [the affiant] has completed the

13

following training. It says I am a certified computer forensic examiner. Then below that, there are four different courses that are listed for basic forensic examiner training in Maitland, Florida. Investigation, prosecution, online child exploitation crimes, investigative techniques and one more in December. The testimony, the evidence that I have heard that this was a boiler plate – those words were not even known by the officer to really be there. It was purely inadvertence on his behalf and not intended by any means to sway the issuing magistrate one way or the other, so I am going to deny the motion on that ground.

As stated above, the trial court's credibility determinations at a suppression hearing carry the weight of a jury verdict and are binding on the reviewing court unless the evidence preponderates against them. *State v. Bishop*, 431 S.W.3d 22, 34-35 (Tenn. 2014). We conclude that the evidence does not preponderate against the trial court's findings. Investigator Cereceres testified that the statement in the affidavit that he was a certified computer forensic examiner was inaccurate, but that the information concerning his training was accurate. He testified that he used a template affidavit containing boilerplate language regarding the affiant's credentials, and he inadvertently left the language in the affidavit. He testified that the inclusion of the inaccurate statement was an oversight and not intended to be deceitful. Defendant presented no evidence to the contrary. Additionally, we conclude that Investigator Cereceres' statement regarding his certification was not essential to the establishment of probable cause. Accordingly, Defendant is not entitled to relief on this issue.

Defendant also asserts that statements contained in the affidavit were shown to be false by the proof presented at trial. Specifically, Defendant asserts that the affidavit contained information that Investigator Cereceres conducted an online investigation on April 12, 2011, and using a file-sharing program, he discovered that images of child pornography had been downloaded to a computer with an IP address located at Defendant's residence. Defendant argues that the affidavit falsely states that Investigator Cereceres used the peer-to-peer software "Limewire," but the evidence at trial established that Defendant's computer used the peer-to-peer software "Frostwire." Upon review of the affidavit in support of the search warrant, the section entitled "Specific Probable Cause," which states the facts particular to this case, does not make reference to Limewire or Frostwire. The section of the affidavit in which Investigator Cereceres references Limewire is entitled "Background of Investigation," and that section makes general statements about peer-to-peer software. In that section of the affidavit, the term "Limewire" is used in the following instances:

1) "Limewire, one type of P2P software, sets up its searches by keywords."

14

2) "For example, a Limewire user downloading an image file may actually receive parts of the image from multiple computers. The advantage of this is that it speeds up the time it takes to download the file. Often, however, a Limewire user downloading an image file receives the entire image from one computer."

3) "The computer running the file sharing application, in this some [sic] cases 'Limewire,' has an IP address assigned to it while it is on the internet."

Our reading of the affidavit does not support Defendant's contention that Investigator Cereceres' references to Limewire, as opposed to Frostwire, were specific to Defendant, but rather a general explanation of peer-to-peer software.

Defendant also challenges the accuracy of the date stated in the affidavit. The affidavit states that Investigator Cereceres' investigation was conducted on April 12, 2011, and Detective Levasseur's report states that Defendant downloaded peer-to-peer software on April 27, 2011. Defendant argues that the date on which the peer-to-peer exchange occurred is crucial to establish a nexus between the alleged criminal activity and the property to be searched.

"To establish probable cause, the affidavit must show a nexus among the criminal activity, the place to be searched, and the items to be seized." *Saine*, 297 S.W.3d at 206 (citing *State v. Reid*, 91 S.W.3d 247, 273 (Tenn. 2002); *Smith*, 868 S.W.2d at 572). In reviewing nexus, reviewing courts should "'consider whether the criminal activity under investigation was an isolated event or a protracted pattern of conduct[,] . . . the nature of the property sought, the normal inferences as to where a criminal would hide the evidence, and the perpetrator's opportunity to dispose of incriminating evidence.'" *Saine*, 297 S.W.3d at 206 (quoting *Reid*, 91 S.W.3d at 275).

We conclude that a nexus existed based on the statements made in the affidavit. The affidavit identifies an IP address "owned and controlled by Charter Communications" and the subscriber was identified as Defendant. There is no explanation in the record for why the date of Investigator Cereceres' investigation, as stated in the affidavit, is earlier than the date on which Detective Levasseur's report states that Defendant downloaded the peer-to-peer software. Because the discrepancy did not arise until trial, there was no ruling by the trial court on this issue at the hearing on Defendant's motions to suppress. However, we have already concluded that the evidence does not preponderate against the trial court's credibility determination regarding Investigator Cereceres' statement of his qualifications. Similarly, we do not believe that Investigator Cereceres intended to deceive the court, or that the statement was recklessly made.

15

C.      Staleness of the affidavit

Defendant contends that the affidavit filed in support of the search warrant was based on a one-time observation of criminal conduct in April, 2011, and therefore was too stale to allow the magistrate to find probable cause that the evidence sought would be located at Defendant's apartment at the time the warrant was executed on July 11, 2011.

A determination regarding staleness must be made on a case-by-case basis. *Norris*, 47 S.W.3d at 470 (citing *Meeks*, 876 S.W.2d 121, 124 (Tenn. Crim. App. 1993)). When the illegal activity described is ongoing or continuous, courts have generally concluded that the affidavit does not become stale with the passage of time. *State v. Hayes*, 337 S.W.3d 235, 259 (Tenn. Crim. App. 2010) (citing *State v. Stepherson*, 15 S.W.3d 898, 903 (Tenn. Crim. App. 1999)); *State v. Thomas*, 818 S.W.2d 350, 357 (Tenn. Crim. App. 1991)).  Unlike evidence that can be easily consumed or destroyed, "the nature of child pornography is not fleeting or isolated. . . .  Rather the collection and sharing of child pornography is of a continuous and ongoing nature and typically remains in possession of the user for an extended period of time." *State v. Robert D. Ewing and Anthony T. Ewing*, No. E2013-01587-CCA-R3-CD, 2014 WL 2609463, at *7 (Tenn. Crim. App., June 11, 2014) (holding that a four-month lapse between the information contained in the affidavit and the execution of the search warrant was not stale); *see also State v. John Jason Burda*, No. M2006-0253-CCA-R3-CD, 2009 WL 1181349, at *4 (Tenn. Crim. App., May 4, 2009).

We conclude that the information contained in the affidavit was not too stale to support a finding of probable cause.  Investigator Cereceres discovered on April 12, 2011, that the person using a computer associated with a particular IP address was in possession of and sharing files depicting images of sexual exploitation of minors. Through a subpoena, Investigator Cereceres learned that the IP address was connected to an account under Defendant's name and address.  Approximately three months elapsed between Investigator Cereceres' discovery and his execution of the search warrant.  The affidavit stated that those known to engage in the collecting of child pornography often use a computer to accomplish this.  The affidavit also stated that people who obtain child pornography "tend to maintain their collections at a secure private location for long periods of time[.]"  Given the nature of the evidence sought, it was reasonable to conclude that the images discovered by Investigator Cereceres in April, 2011, remained on Defendant's computer at the time the search warrant was executed in July, 2011. Defendant is not entitled to relief on this issue.

16

*Admissibility of Defendant's statement*

Defendant contends that his statement to Investigator Cereceres should have been suppressed because 1) it was "fruit of the poisonous tree" obtained as a result of the execution of an invalid search warrant, and 2) the statement was obtained in violation of Defendant's *Miranda* rights. The State responds that Defendant was not in custody for the purposes of *Miranda* at the time of questioning by Investigator Cereceres.

Under the "fruit of the poisonous tree" doctrine, evidence that is obtained through exploitation of an unlawful search or seizure must be suppressed. *See Wong Sun v. U.S.*, 371 U.S. 471, 488, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). We have concluded that the trial court did not err in denying Defendant's motions to suppress the search warrant. Therefore, Defendant's subsequent statement and evidence from the search warrants were not "fruit of the poisonous tree." We will review whether Defendant's statement was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Both the federal and state constitutions protect a defendant against compelled self-incrimination. U.S. Const. amend. V; Tenn. Const. art. I § 9; *see*, *e.g.*, *State v. Sawyer*, 156 S.W.3d 531, 534 (Tenn. 2005). In *Miranda v. Arizona*, the United States Supreme Court adopted broad procedural safeguards designed to protect an individual's right against self-incrimination. *Miranda*, 384 U.S. at 479. The Court held that the exclusionary rule requires the suppression of statements made by a defendant during custodial interrogation unless the police have first advised the defendant "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id.* at 479.

Defendant contends that the trial court declined to address the issue of whether Defendant was in custody for purposes of *Miranda*, but that its findings "would appear to bear on the question of whether [Defendant] was in fact in custody." The State asserts that the trial court's comments indicate that the court concluded Defendant was not in custody. The trial court's findings are as follows:

> The evidence that I have heard on this motion is that – of course, very contradictory. In looking at Exhibit 5 [the Admonition and Waiver document], the testimony of [Defendant] too, he would have probably arrived back at his apartment around 5:20, 5:25, pretty quick gotten the rights advisement by 5:29, certainly not that statement, could not have been done in that time frame so I believe that he was given his Miranda [w]arnings when he signed that at 5:29 on the back of Exhibit Number 5.

17

He was, of course, in my findings, given those rights to him, whether or not he was in custody, is something entirely different. I am not going to reach that for this purpose. I don't have to. He is in his own bedroom and the testimony that I heard, he was called by his roommate, hey the police are here with a search warrant. There is no mention that the police wanted him to come back to his apartment, but as he said, he rapidly got back to see what was going on.

When he came into the apartment, then the rest of this occurred. So – I believe the statement is admissible and I am not going to – I am going to deny the motion to suppress.

Defendant asserts that the following undisputed testimony of Officer Cereceres on cross-examination preponderates against the trial court's finding that Investigator Cereceres did not request Defendant's presence at the apartment during the execution of the search warrant:

Q. [Y]ou could have executed that search warrant regardless of whether he was present or not present, is that a fair statement?

A. That's right.

Q. And no need for him to be there?

A. No. I like to have everyone there, whose ever room that is, I would like them to be there during execution to obtain statements.

Q. Who said I would like him to be there?

A. I, myself, did.

Q. You communicated that to [Defendant]'s – one or both of [Defendant]'s roommates?

A. Yes, sir.

. . . .

18

Q. Okay – and when [Defendant] arrived back there following your request that he be contacted – well, let me back up, is it fair to say that you requested the roommates to contact him.

A. Yes, sir.

The State acknowledges that Investigator Cereceres requested Defendant's presence, but the State argues that Cereceres "did not command him to return[.]" Defendant argues that this undisputed testimony by Investigator Cereceres preponderates against "the only findings recited by the trial court on the question of whether [Defendant] was in custody[.]" We agree with Defendant that the testimony by Investigator Cereceres at the suppression hearing is inconsistent with the trial court's finding that "[t]here is no mention that the police wanted him to come back to his apartment." Nevertheless, we disagree with Defendant's contention that Investigator Cereceres' request that Defendant be present during the execution of the search warrant established that Defendant was in custody at the time of questioning. The evidence showed that Investigator Cereceres did not call Defendant and order him to return to the apartment.

Investigator Cereceres testified Defendant's presence was not required, but that he preferred to have all residents present during the execution of a search warrant. When Defendant arrived at the apartment, Investigator Cereceres identified himself, explained his purpose for being there, and gave Defendant a copy of the search warrant. He did not place Defendant under arrest when he arrived. Investigator Cereceres denied that he kept Defendant from talking to his roommates, but he acknowledged that the roommates were writing statements with another officer in another room. Investigator Cereceres testified that Defendant "came back to the residence very compliant, [and he] saw no reason to take him out of his house and say you are going to the station." He testified, "I wanted to have [Defendant] in his own house, where he was comfortable to be at rather than taking him to the station if he was more than willing to speak in his own residence." Investigator Cereceres testified that Defendant did not attempt to leave or end the interview.

Investigator Cereceres asked Defendant if he had a computer, and Defendant responded that his computer was in his bedroom. Investigator Cereceres followed Defendant into his bedroom, and they sat on Defendant's bed. Investigator Cereceres then told Defendant that he had questions for Defendant. Investigator Cereceres testified that he advised Defendant of his rights and that Defendant signed the waiver form prior to providing his written answers to Investigator Cereceres' questions on the opposite side of the waiver form. Defendant testified that Investigator Cereceres instructed him to sign the waiver form after he wrote his answers as verification that his answers were accurate

19

and true. Defendant testified that he did not read the document before he signed it, and he did not recall being advised of his constitutional rights.

In ruling on Defendant's motion to suppress his statement, the trial court recognized that there was a conflict in testimony regarding whether Defendant was advised of his *Miranda* rights, and the court resolved that conflict in favor of the State, finding that Defendant was advised of his rights prior to providing his written answers to Officer Cereceres' questions. We conclude that the evidence does not preponderate against this finding by the trial court. Since we conclude that Defendant was properly advised of his *Miranda* rights and signed the waiver, there is no need to resolve the question of whether he was in custody. Moreover, although the trial court did not make a finding as to whether Defendant's waiver was voluntary, we conclude that the evidence supports such a finding.

Defendant argues that he was subjected to "an un-warned custodial interrogation" before Investigator Cereceres advised Defendant of his rights when he asked Defendant if he had a computer and whether peer-to-peer software was installed on his computer. Defendant argues that these questions were central to the State's case because when Investigator Cereceres arrived at the apartment to execute the search warrant, he "was looking for someone residing at the home who was willing to admit to having downloaded a peer-to-peer software program[.]" Defendant asserts that after Defendant answered affirmatively that he had downloaded peer-to-peer software on his computer, Investigator Cereceres gave *Miranda* warnings and Defendant gave his written responses to Investigator Cereceres' questions. Investigator Cereceres testified, however, that he asked Defendant about peer-to-peer software after Defendant gave his statement, and thus, after Defendant had waived his *Miranda* rights. Investigator Cereceres testified that the information available to him and provided in the affidavit for a search warrant was that the IP address for the computer was linked to an account in Defendant's name. He testified that he conducted a preliminary search on the computers belonging to Defendant's roommates and found no peer-to-peer software installed. The roommates had also given statements "adamantly denying" that they did not download peer-to-peer software. We conclude, therefore, that any answers Defendant provided before waiving his rights, if admitted in error, was harmless error.

*Sufficiency of the evidence*

Defendant contends that the evidence was insufficient to support his convictions. Specifically, Defendant asserts that the State failed to prove that he "knowingly possessed" images depicting the sexual exploitation of minors. Defendant argues that there was no proof discerning which of the more than 4,000 images shown to the jury were the "more than 700 live files discovered by the forensic exam" to support the

convictions.  He also argues that there was no proof which of "3,300 or more 'deleted' images found on his computer could possibly have been 'live' on the system during the period of May, 2011, through July, 2011."  The State responds that the evidence is sufficient to support the jury's conclusion that Defendant knowingly possessed the images during the time period charged.

When a defendant challenges the sufficiency of the evidence, this court is obliged to review that claim according to certain well-settled principles.  The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt.  *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict.  *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002).  The prosecution is entitled to the "strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom."  *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)).  It is not the role of this court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact.  *Reid*, 91 S.W.3d at 277.  Questions concerning the "'credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact.'"  *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)).  "'A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory.'"  *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)).  This standard of review applies whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two.  *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

Defendant was charged with 39 counts of sexual exploitation of a minor, with one count charging possession of 50 or more videos depicting minors engaged in sexual activity or simulated sexual activity, and 38 counts charging possession of greater than 100 images depicting minors engaged in actual or simulated activity.  Defendant was convicted of possessing greater than 100 images in four counts, possessing greater than 50 but fewer than 100 images in eleven counts, and possessing fewer than 50 images in 24 counts.

Tennessee Code Annotated section 39-17-1003 defines the offense of sexual exploitation of a minor and provides, "It is unlawful for any person to knowingly possess

material that includes a minor engaged in . . . [s]exual activity; or [s]imulated sexual activity that is patently offensive." T.C.A. § 39-17-1003(a).

The indictment alleged in all counts that Defendant knowingly possessed videos and images containing child pornography between May, 2011, and July, 2011. Defendant argues that Detective Levassuer's testimony regarding the quantity and type of files downloaded, the location of the files on Defendant's computer, and the distinction between "live" files and "deleted" files failed to establish that Defendant knowingly possessed any specific number of files during the charged time period.

Viewing the evidence in the light most favorable to the State, the evidence established that Detective Levasseur discovered on Defendant's computer 61 videos and more than 4,000 images depicting children engaged in sexual activity. Detective Levasseur identified the images the jury was to consider in determining its verdict in counts 2 through 39, which charged Defendant with possessing image files. Count 1 charged Defendant with possession of the video files. The sheer number of images and videos, as well as Detective Levasseur's testimony that "all of the child pornography files came from frostwire application and from Yahoo instant messenger" indicates that download activity was intentional and not accidental. Detective Levasseur testified that "a number of child pornography files" were downloaded to Defendant's computer on April 29, 2011; May 4, 2011; May 15, 2011; June 7, 2011; June 8, 2011; June 15, 2011; June 16, 2011; June 18-19, 2011; July 5, 2011; July 11, 2011. He also testified that "hundreds of child pornography and child erotica were deleted" on July 10, 2011. Detective Levasseur did not testify that the "deleted" files could not be accessed by a user of the computer, as Defendant asserts in his brief. He testified that deleted files "could be in the recycle bin **or** be in unallocated space **or** could be a system file that you don't really have access to." He also noted that these "deleted" files must have been "live" on the computer before they could make their way into the unallocated space.

Defendant attempts to distinguish this case from *State v. Aguilar*, 437 S.W.3d 889 (Tenn. Crim. App. 2013), in which this court upheld the sufficiency of the convicting evidence, but we fail to see the distinction. In that case, the same forensic examiner, Scott Levasseur, testified that he discovered 167 images and six videos depicting children engaged in sexual activity on the defendant's computer. Detective Levasseur "testified that the vast majority of the images were found in the unallocated space on defendant's computer, indicating that the files had been deleted." *Id*. at 903. In *Aguilar*, we concluded "[t]hat the defendant could not have accessed the files in the unallocated space at the time of Detective Levasseur's examination did not negate the fact that the presence of the files in that space indicated that they had been manually and individually downloaded onto the defendant's computer and that they were, within the time frame provided in the indictment, 'live on the system.'" *Id*.

We conclude that the evidence supports the jury's finding that Defendant knowingly possessed the materials during the dates charged in the indictment. Defendant is not entitled to relief on this issue.

*Hearsay testimony*

Defendant contends that the trial court erred by admitting hearsay testimony. Defendant also argues that the admission of the statement violated his right to confrontation pursuant to the federal and state constitutions.

During cross-examination, defense counsel asked Investigator Cereceres whether anyone observed Defendant download child pornography onto his computer. Investigator Cereceres agreed with defense counsel that "there is not going to be a single witness come in here and say that they observed [Defendant] physically downloading any of this stuff[.]" On redirect examination by the State, Investigator Cereceres was asked about whether any other individuals present at Defendant's apartment during the execution of the search warrant were asked if they had seen Defendant looking at child pornography on his computer. Defense counsel objected on the grounds of hearsay, and the court overruled the objection. Investigator Cereceres then testified, "The only thing that was relayed by one of the parties says – pardon me, there will be an expletive relayed on this, when one of the parties spoke, *he* stated [']I wouldn't do that, that's got to be f****** Doria.[']" (Emphasis added). On recross examination, defense counsel asked Investigator Cereceres if he recalled who made that statement, and he did not recall.

Defendant argues that the testimony was inadmissible hearsay. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). In general, hearsay statements are inadmissible. Tenn. R. Evid. 802. Whether a statement constitutes hearsay and whether it falls under one of the exceptions to the hearsay rule "are questions of law subject to a de novo review." *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015).

In overruling Defendant's objection, the trial court did not give a reason for its ruling. In its brief on appeal, the State does not assert either that the statement was not offered for the truth of the matter asserted or that the statement falls within an exception to the hearsay rule. Without providing any citation to applicable case law, the State submits only that if the testimony was admitted in error, it was harmless error because the declarant, referred to as "he" (by process of elimination, either Mr. Nacin or Mr. Porter) testified at trial; therefore, Defendant was not deprived his right to confrontation because he had the opportunity to cross-examine the declarant about the statement.

23

In a criminal trial, the defendant has a right "to be confronted with the witnesses against him." U.S. Const. amend. VI. Similarly, the Tennessee Constitution provides "[t]hat in all criminal prosecutions, the accused hath the right . . . to meet the witnesses face to face." Tenn. Const. art. I, § 9. In deciding issues under the Confrontation Clause in the Tennessee Constitution, we apply the same analysis used to evaluate claims based on the Confrontation Clause of the Sixth Amendment to the United States Constitution. *State v. Hutchison*, ___ S.W.3d ___, 2016 WL 531266 (Tenn. 2015).

"[T]he threshold question in every case where the Confrontation Clause is relied upon as a bar to the admission of an out-of-court statement is whether the challenged statement is testimonial." *State v. Dotson*, 450 S.W.3d 1 (Tenn. 2014) (citing *State v. Cannon*, 254 S.W.3d 287, 301 (Tenn. 2008)); *see also Crawford v. Washington*, 541 U.S. at 51-52, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). The Confrontation Clause applies only to "testimonial statements" and is not implicated where the evidence in question is nontestimonial hearsay. *Davis v. Washington*, 547 U.S. 813, 823-24, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006); *see Dotson*, 450 S.W.3d at 63.

In *State v. Maclin*, 183 S.W.3d 335 (Tenn. 2006), the Tennessee Supreme Court examined the admissibility of both testimonial and nontestimonial statements post-*Crawford*. In *Maclin*, the court determined:

> When the prosecution seeks to introduce a declarant's out-of-court statement, and a defendant raises a Confrontation Clause objection, the initial determination under *Crawford* is whether the statement is testimonial or nontestimonial. *Crawford*, 541 U.S. at 68. If the statement is testimonial, then the trial court must determine whether the declarant is available or unavailable to testify. **If the declarant is available, then there is no confrontation problem**: "[t]he Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." *Id*. at 59 n. 9 (citing *California v. Green*, 399 U.S. 149, 162, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970)).

*Id*. at 351 (emphasis added).

Defendant contends that the statement at issue is testimonial in nature, and we agree with Defendant. Because the statement was testimonial, the state and federal constitutions permitted the introduction of the statement only if the declarant was unavailable at trial and Defendant had had a prior opportunity to cross-examine. *State v. Lewis*, 235 S.W.3d 136, 142 (Tenn. 2007) (citing *Crawford*, 541 U.S. at 68, 124 S. Ct. 1354)). The State argues that the record shows that the declarant was, in fact, available at

24

trial. Although Investigator Cereceres could not identify the declarant, he indicated that the declarant was male by using the pronoun "he," excluding Andrew Porter's girlfriend as the possible declarant, and both of Defendant's male roommates were called to testify following Investigator Cereceres' testimony. Therefore, the State asserts, Defendant had the opportunity to confront the declarant of the statement. Both men denied witnessing Defendant download or view child pornography on his computer.

We agree with the State's assessment. Defendant acknowledges that two of the three parties present at the apartment during the execution of the search warrant were called as witnesses at trial. The State is correct that the third person was Mr. Porter's girlfriend, and Investigator Cereceres identified the declarant as a male. Therefore, the declarant was available at trial and subject to cross-examination. Consequently, the admission of the statement did not violate the Confrontation Clause. Defendant is not entitled to relief on this issue.

*Relevant evidence*

Defendant contends that the trial court erred by allowing the State to introduce a report prepared by Detective Levasseur referencing a video file of "a dog having sex with an adult female," and 18 video files depicting "beastiality." Prior to trial, Defendant filed a motion in limine under Tennessee Rules of Evidence 401, 403, and 404 seeking to exclude the State from introducing evidence suggesting Defendant had visited the website www.beast-dating.com or that he possessed images of humans engaging in sexual activity or simulated sexual activity with animals. The trial court granted Defendant's motion. At trial, the report was admitted without redactions to all references of beastiality. Specifically, the 27-page report included the following two references to beastiality:

> 1. "There are 33 pornography video files in the recycle bin, 31 of them are child pornography [and] 1 of a dog having sex with an adult female and one of a rape of an Asian female by several people."

> 2. "There are a total of 66 pornographic video files on the drive that have not been deleted, 34 of these are child pornography [and] of the remaining 32, 18 of them are beastiality."

The State responds that any error in not redacting those parts of Detective Levasseur's report referencing beastiality is harmless in light of Defendant's statement admitting to having used the search term "to find role playing material." We note that Defendant failed to mitigate the error by not renewing the objection at trial to the contents of the report or any references to beastiality. Nevertheless, we agree with the

25

State's assertion that Defendant was not prejudiced by the trial court's error in admitting the evidence.

Because it was irrelevant, the trial court should have redacted the mentions of bestiality from the report shown to the jury, but its failure to do so was harmless error under Tennessee Rule of Appellate Procedure 36(b) in light of the record as a whole. Defendant admitted in his statement to Investigator Cereceres and testified at trial that he used the search term "beastiality" to "find role playing material." Detective Levassuer made no mention of beastiality in his trial testimony. Based on the record before us, we cannot say that any error in admitting the unredacted portions of the report "more probably than not affected the judgment." Tenn. R. App. P. 36(b). Defendant is not entitled to relief on this issue.

Defendant also asserts that the trial court erred by permitting the State to use a Powerpoint presentation prepared by Detective Levasseur during his direct examination. Defendant argues that the content was irrelevant and prejudicial. The State fails to respond altogether to this issue raised by Defendant.

At trial, defense counsel objected to the State's use of a Powerpoint presentation prepared by Detective Levasseur. Defense counsel specifically objected to the content of the presentation as irrelevant and objected to the State's use of the presentation during its direct examination of Detective Levasseur because "if the evidence is presented in this fashion, then that robs defense counsel of the ability to hear something beforehand to determine whether or not [] there is a question that would elicit relevant or irrelevant evidence or admissible evidence to make a timely objection[.]" The trial court ruled that the Powerpoint could be used as long as it was presented one slide at a time and not shown to the jury until a question was first posed to Detective Levasseur regarding the information on the following slide. Defendant argues that the State failed to follow the trial court's instructions, and instead presented each slide to the jury while simultaneously asking Detective Levasseur what information was contained on the slide. Defendant argues that he was prejudiced by the State's use of the Powerpoint, because the Powerpoint was not used as a tool for assisting the jury in understanding Detective Levasseur's testimony, and that the slides contained "irrelevant but inflammatory references" to instant chatting messages of a sexual nature between Defendant and other adult users.

Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R.

26

Evid. 403. Prejudicial evidence is not excluded as a matter of law. *State v. Carruthers*, 35 S.W.3d 516, 577 (Tenn. 2000) (citing *State v. Gentry*, 881 S.W.2d 1, 6 (Tenn. Crim. App. 1993)). The term "undue prejudice" has been defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Comm'n Notes). We review a trial court's decision regarding the admissibility of evidence under an abuse of discretion standard. *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008).

Defendant objected at trial to one slide before it was presented to the jury on the grounds that it was an improper opinion. The slide states, "[Defendant]'s statement to police was that he accidentally downloaded child sex abuse images of mothers with their kids. . . . The Yahoo Chat files recovered prove he was actively searching for requesting and downloading these files, and then commenting on how he enjoyed them. More than 400 Child Porn images [were] found that were received from Yahoo photo share[.]" The trial court overruled the objection and found that Detective Levasseur had already testified to the content of the statement contained on the slide. The testimony preceding the presentation of that slide regarded Detective Levasseur's findings that Defendant used fictitious profiles, including "tits_hottie" and "Jennifer Relsarro" to locate and download child pornography files.

Having reviewed the record, we conclude that neither Detective Levasseur's testimony, nor the content of the Powerpoint slides, was irrelevant. Evidence of the creation of false user profiles was relevant to establish Defendant's identity as the person who downloaded images of minors engaged in sexual activity. Evidence of the chat files were relevant to establish that Defendant was searching for illegal material, contrary to his assertion in his statement to Investigator Cereceres that he downloaded the images by accident. Defendant is not entitled to relief on this issue.

*Double jeopardy*

Defendant contends that his convictions violate double jeopardy. Specifically, Defendant asserts that he may have been convicted of possessing multiple duplicated images created by only one intentional or knowing act because the State failed to specify the names or dates of download or deletion of the files shown to the jury, and the jury failed to specify which images for which Defendant was found guilty of possessing, leading to the possibility that Defendant could be prosecuted again for the same acts for which he had already been convicted.

The double jeopardy clause of the Fifth Amendment to the United States Constitution provides that no person shall "be subject for the same offense to be twice put

27

in jeopardy of life or limb. . . ."  Article 1, section 10 of the Tennessee Constitution contains a similar provision.  The three fundamental principles underlying double jeopardy provide protections against (1) a second prosecution after an acquittal; (2) a second prosecution after conviction; and (3) multiple punishments for the same offense. *State v. Watkins*, 362 S.W.3d 530, 541 (Tenn. 2012).  Defendant's contentions involve the second and third categories.

As noted above, Defendant asserts that the State duplicated images in different counts of the indictment "raising the possibility if not likelihood that [Defendant] was convicted for possessing multiple images created at the same time and as a result of the same intentional action proscribed by the statute under which Defendant was convicted." Defendant argues that the jury failed to specify the images supporting his convictions, and nothing prevents the State from prosecuting him a second time for possessing the same image files.

"Multiplicity concerns the division of conduct into discrete offenses, creating several offenses out of a single offense."  *State v. Phillips*, 924 S.W.2d 662, 665 (Tenn.1996).  Of primary importance when considering a claim of multiplicity is legislative intent regarding cumulative punishment.  *Watkins*, 362 S.W.3d at 542 ("Legislative intent with respect to punishment remains the focus of the analysis when a defendant in a single prosecution relies upon the Double Jeopardy Clause's protection against multiple punishments.").  Noting that "[t]he Double Jeopardy Clause does not limit the legislative authority to define criminal offenses and to prescribe punishments," the supreme court observed that "in single prosecution cases, the double jeopardy prohibition against multiple punishments functions to prevent prosecutors and courts from exceeding the punishment legislatively authorized."  *Id.* (citation omitted).  Our supreme court has observed that the legislature sets the unit of prosecution and, in doing so, establishes "the minimum unit of conduct that may be prosecuted as a separate offense."  *Id.* at 554.

In this case, Defendant was convicted of violating Tennessee Code Annotated section 39-17-1003.  Under a prior version of section 39-17-1003, courts of this state have found multiple convictions arising under this criminal statute to be multiplicitous. For example, in *State v. Pickett*, 211 S.W.3d 696 (Tenn. 2007), the defendant was convicted of eleven counts of sexual exploitation of a minor based upon eleven images that were found on his computer depicting child pornography.  211 S.W.3d at 700.  The Tennessee Supreme Court held that the eleven convictions were multiplicitous and that the evidence only supported one conviction.  *Id.* at 706.  The supreme court noted in this regard that the State's proof did not "attempt to distinguish the offenses by showing that the crimes were separated by time or location or by otherwise demonstrating that [the defendant] formed a new intent as to each image."  *Id.*

28

In 2005, the legislature amended section 39-17-1003 by adding the following provision, "Where the number of materials possessed is greater than fifty (50), the person may be charged in a single count to enhance the class of offense under subsection (d)." T.C.A. § 39-17-1003(b). The amendment gives the State discretion to aggregate the offenses. *See State v. David Wayne Phillips*, No. M2011-01920-CCA-R3-CD, 2012 WL 2870597 (Tenn. Crim. App., Nashville, July 13, 2012); *State v. Walter Jude Dec*, No. M2009-01141-CCA-R3-CD, 2010 WL 2977875 (Tenn. Crim. App., Nashville, July 30, 2010). This court addressed the issue in *State v. Aguilar*, 437 S.W.3d 889 (Tenn. Crim. App. 2013), in which this court held that by amending section 39-17-1003, the legislature intended to permit "multiple aggregation of offenses." *Id.* at 909. Because the Defendant's convictions are permitted by the statute, they do not violate double jeopardy. Defendant is not entitled to relief on this issue.

*Sentencing*

Defendant contends that the trial court abused its discretion by imposing partial consecutive sentencing because the trial court considered offenses for which Defendant was being sentenced as evidence of Defendant's "extensive criminal activity" under Tennessee Code Annotated section 40-35-115(b)(2). The State responds that the trial court's order of partial consecutive sentencing was supported by the record and consistent with the purposes and principles of sentencing.

When reviewing a trial court's imposition of consecutive sentences, "the presumption of reasonableness applies," which gives "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013). "Any one of [the] grounds [listed in section 40-35-115(b)] is a sufficient basis for the imposition of consecutive sentences." *Id.* at 862 (citing *State v. Dickson*, 413 S.W.3d 735 (Tenn. 2013)).

Here, the trial court concluded that the Defendant was an offender whose record of criminal activity was extensive. *See* T.C.A. § 40-35-115(b)(2). The trial court based its finding on offenses for which Defendant was being sentenced. The trial court stated,

> I guess most of the time that I spent thinking about this case is under 40-35-115. He has now become an offender whose record of criminal active [sic] is extensive. He has an extensive number of convictions, most of which occurred at – or – or one – say two or more occasions.

29

In *State v. Cummings*, 868 S.W.2d 661, 667 (Tenn. Crim. App. 1992), this court affirmed the trial court's imposition of consecutive sentences based on a defendant's current offenses as a record of extensive criminal activity. Like Defendant, the defendant in *Cummings* had no criminal history outside of his convictions in the case for which he was being sentenced. Defendant attempts to distinguish *Cummings* on the basis that the defendant in Cummings was charged with prescription fraud, and the State did not have the charging discretion authorized by Tennessee Code Annotated section 39-17-1003 as it did in this case. Defendant argues that because the State had discretion whether to charge Defendant separately for each image, it should not be permitted to rely on multiple convictions for the imposition of consecutive sentencing. Defendant warns of the "danger" in applying the *Cummings* holding to defendants charged under section 39-17-1003 and asks this court to "modify[ ] or expand[ ] on the current discretionary interpretation of the 'may' clause of § 39-17-1003 . . . [by] prohibiting enhancement of a sentence or consecutive sentencing based on the number of images included in any or all counts on which a defendant is convicted, and permitting the courts to 'merge' the convictions into one solely for the purpose of determining prior criminal history for enhancement and consecutive sentencing purposes." We decline to do so. We are bound by the precedence of our supreme court, which has held that consecutive sentencing is within the discretionary authority of the trial courts. *Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013). Defendant is not entitled to relief on this issue.

CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, PRESIDING JUDGE